

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

**NO. 02-13-00062-CV**

IN THE INTEREST OF K.N., A
CHILD

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

In two related issues concerning evidentiary sufficiency, appellant S.H. (Mother) appeals the trial court's order terminating her parental rights to her daughter, K.N. (Kathryn).[2]  We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

[2]To protect K.N.'s anonymity, we will use "Kathryn" as her alias.  *See* Tex. Fam. Code Ann. § 109.002(d) (West Supp. 2012); Tex. R. App. P. 9.8(b)(2).

**Background Facts**

While pregnant with Kathryn, Mother used cocaine. Mother gave birth prematurely to Kathryn on March 27, 2011. Since her birth, Kathryn has had various medical problems, including acid reflux, a low body weight, intermittent stoppages of breathing, and brain damage that has caused developmental delays. Kathryn is missing part of her corpus callosum, which connects the two hemispheres of a human's brain.

Three days after Kathryn's birth, the Department of Family and Protective Services (the Department) filed a petition stating that she was in immediate danger, asking to be designated as her temporary sole managing conservator, and seeking the termination of Mother's parental rights to her if reunification between them could not be achieved. The Department attached an affidavit to its petition to inform the trial court that, among other facts, Mother and Kathryn had tested positive for cocaine upon Kathryn's premature birth. Before and after conducting an adversary hearing,[3] the trial court issued orders naming the Department as Kathryn's temporary sole managing conservator.

At some time after Kathryn's birth, she began living in foster care. In early May 2011, the Department filed its initial service plan. In the plan, the Department elaborated on the reasons for Kathryn's removal; expressed its permanency goal as family reunification; and assigned Kathryn's parents,

---

[3]*See* Tex. Fam. Code Ann. § 262.201(a) (West Supp. 2012).

including T.N. (Father), to complete several tasks, such as participating in random drug testing, visiting Kathryn weekly, maintaining stable housing, participating in drug treatments (if recommended after an assessment), taking parenting classes, and completing individual counseling. Following a status hearing that the trial court held shortly after the Department filed its service plan, the court ordered the parents to comply with the plan and informed them that their compliance with the plan would be reviewed at all subsequent hearings.

In December 2011, through a permanency progress report, the Department informed the trial court that Mother was "in compliance with services" at that time but that Father was not.[4] But in January 2012, in a permanency hearing order, the trial court found that Mother had not demonstrated "adequate and appropriate compliance with the service plan."

After the parties appeared at a hearing in January 2012 concerning the potential termination of Mother's and Father's parental rights, the trial court found in March 2012 that termination of their parental rights to Kathryn was not in Kathryn's best interest, and the court therefore denied termination at that time. But the court appointed the Department as Kathryn's permanent managing conservator.[5] A week after the trial court designated the Department as

---

[4]During the February 2013 final trial on the Department's petition for termination, Mother testified that she had completed counseling, drug treatment, and parenting classes in an effort to "get [Kathryn] back."

[5]The record from the January 2012 hearing has not been filed in this court.

Kathryn's permanent managing conservator, on March 14, 2012, it rendered an order listing several actions necessary for Mother to obtain Kathryn's return.

In October 2012, the Department filed another petition seeking termination of Mother's parental rights to Kathryn. In February 2013, after conducting a trial on that petition, the trial court terminated Mother's parental rights to Kathryn, finding that Mother had engaged in conduct that had endangered Kathryn's physical or emotional well-being[6] and that termination was in Kathryn's best interest.[7] Mother brought this appeal.

## The Evidence Supports the Trial Court's Best Interest Finding

In Mother's issues, she contends that the trial court erred by terminating her parental rights to Kathryn because the Department failed to prove by clear and convincing evidence that termination was in Kathryn's best interest. We construe both of Mother's issues as a challenge to the legal and factual sufficiency of the evidence supporting termination.

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Termination decisions must be supported by clear

---

[6] *See* Tex. Fam. Code Ann. § 161.001(1)(E) (West Supp. 2012).

[7] The trial court also terminated Father's parental rights; he has not appealed the trial court's order.

4

and convincing evidence. Tex. Fam. Code Ann. § 161.001. Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982)); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2008).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire

record, a factfinder could reasonably form a firm conviction or belief that termination of the parent-child relationship was in Kathryn's best interest. *See* Tex. Fam. Code Ann. § 161.001(2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). In considering a parent's willingness and ability to provide the child with a safe environment, we may consider, among other factors, the child's age and physical and mental vulnerabilities; the magnitude, frequency, and circumstances of the harm to the child; and whether there is a history of substance abuse by the child's family. *Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116. Other factors that the factfinder in a termination case may use in determining the best interest of the child include the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals seeking custody, the plans for the child by these individuals or by the agency seeking custody, the stability of the home or proposed placement, the acts or omissions of the parent which may indicate that

6

the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

The trial court's March 14, 2012 "AGREED ORDER FOR ACTIONS NECESSARY FOR PARENT TO OBTAIN RETURN OF CHILD" required Mother to file written documentation of her residence, complete random drug tests, complete a drug assessment, attend outpatient drug treatment, visit Kathryn weekly, attend all of Kathryn's scheduled medical appointments, complete a CPR course, regularly participate in Narcotics Anonymous (NA) meetings and provide evidence of such participation, file a monthly report "indicating all support that she ha[d] received from her family members," provide written documentation of her employment, and pay child support. Mother expressed her understanding at trial that this order gave her a second opportunity to demonstrate to the trial court that she could meet Kathryn's needs and could safely care for her. But after March 14, 2012, although Mother passed random drug tests,[8] she did not consistently inform the trial court about where she resided, did not complete a drug assessment, did not attend outpatient drug treatment (although, according to her testimony, she had completed such treatment and had also finished counseling before March 14), missed several weekly visits with Kathryn, missed most of Kathryn's medical appointments, did not attend a CPR course, did not

---

[8]Gladys Demus, Kathryn's caseworker from the Department, testified that Mother had three drug tests in 2012 and that she had passed all of them.

provide written proof of attendance at NA meetings, did not report to the court about support from her family members, did not provide documentation of her employment, and did not pay child support.

During the visits with Kathryn that Mother attended, Mother was attentive to Kathryn, played with her, sang to her, and read books to her. Kathryn and Mother bonded during those visits. But Demus testified that out of approximately forty-six possible visits between Mother and Kathryn from March 2012 until the trial in February 2013, Mother had attended only about twenty-one visits. Mylye Greenbach, a CASA worker who had been assigned to Kathryn's case from June 2011 until the trial in February 2013, confirmed that Mother had missed twenty-five visits with Kathryn. Demus opined that Mother's regular attendance at visits was important because she needed to "get to know" Kathryn.

Mother conceded that she knew of the need to attend Kathryn's appointments to learn of Kathryn's health issues.[9] Demus explained, however, that out of between fifty and sixty medical appointments for Kathryn in the year preceding the trial, Mother had attended "about three." Demus testified that sixty percent of Kathryn's brain was not functioning, which affected "her developmental needs as far as, like, her speech and things like that." Demus also said that Kathryn was continuing to struggle with her acid reflux, was

[9]Mother testified that she had attended "medical school" to understand Kathryn's needs and to perhaps get a job in the medical field but that she had stopped attending the school after being informed that she was unlikely to get hired as a medical assistant because she was a felon.

8

"throwing up a lot of . . . food," and was not gaining the weight that she needed to.

Greenbach testified that she had encouraged Mother to attend Kathryn's medical appointments but that Mother had changed her phone number four times and that by the time of trial, Greenbach did not have a valid phone number for Mother. According to Greenbach, each of the three times that Mother appeared for Kathryn's medical appointments, Mother was at least twenty minutes late. Demus expressed her belief that Mother would not be able to meet Kathryn's medical needs, and Greenbach explained that if Mother had attended the appointments, she would have learned that

> more than likely, [Kathryn] is going to be speech delayed. More than likely, she's going to have coordination issues. And more than likely, she's going to be frustrated and she's going to have [behavioral] issues. She's shown all those signs. . . . You know, these are things that [Mother] has to be prepared for.
>
> [Kathryn] has allergies. Foster mom has a chart. You know, she can have eggs, but she can only have two eggs per week, say. She has charts of all this because this child needs to eat. And at one point, [Kathryn] was allergic to everything. Now they're bringing stuff back, but she has to gauge it and make sure she doesn't have too many of one thing per week, and foster mom does that.

According to Mother's testimony at trial, she missed some visits and appointments with Kathryn because the visits and appointments were set to occur during workdays, Mother's employment was a long distance from where the visits and appointments were to occur, and Mother's employer became dissatisfied with Mother's missing work to attend the visits. Thus, on appeal,

9

Mother contends that the "order that [she] was supposed to follow to get [Kathryn] back proved impossible to comply with" because of the conflict between Mother's employment and the scheduled visits and appointments. Mother testified that she was employed with a cleaning service for about a month in early 2013, which required her to work normal business hours and sometimes longer, and she testified that she missed some visits in September 2012 because she "had a job." But Mother also testified that she had not been employed consistently since March 2012, and she did not particularly attribute her work as a reason that she missed specific visits after March 2012 other than visits in September 2012 and early 2013. Mother testified that she had missed some visits because she was in jail "for tickets."[10]

At the termination trial, Mother expressed her belief that she was ready to take Kathryn home and to safely parent her. But just before trial, Mother had lost a job with a cleaning service because she was "trying to take off to go to see [Kathryn]," and after being evicted from a residence, she had been living in her uncle's house without paying rent for a few months.[11] Mother expressed her belief that she could meet Kathryn's needs financially by getting paid to babysit other children, but Mother did not provide details about how much money she

---

[10]Mother had a felony criminal case pending at the time of the termination trial, but the record does not disclose what type of charge that case concerned.

[11]Mother had not provided any information about her uncle to the Department.

made by babysitting. Other than babysitting, Mother was not employed at the time of the trial; Demus expressed that Mother's lack of employment was important because Kathryn's medical treatments would be costly.

Mother testified that she had passed all of her random drug tests, that she was attending NA approximately four or five times per week, and that she talked to her NA sponsor every day. Demus testified, however, that Mother had not provided any sign-in sheets and had not otherwise verified her attendance at NA.

Demus stated that Kathryn was "making a lot of progress" in the foster home that she had been placed in for two years but that Kathryn's doctors were "thinking that maybe some of the symptoms [from Kathryn's brain defect were] going to start showing up when she turn[ed] about two or three years old" by affecting, for example, Kathryn's motor skills. At the time of the termination trial, Kathryn was "hardly ever speak[ing] at all." Demus expected that Kathryn's acid reflux would require her to have surgery before she turned three years old, and Demus testified that she would be concerned for Kathryn's safety if Kathryn was returned to Mother because Demus did not know how Mother could transport Kathryn to her medical appointments.

Kathryn's foster family wanted to adopt her, and Demus and Greenbach opined that the family could meet Kathryn's needs. Concerning Kathryn's comparative bonding with Mother and with her foster family, Greenbach testified,

> [Kathryn] goes to the foster mom. Foster mom is her mom. That's her home. That's her mom. I can tell they've bonded. With [Mother], it's gotten less and less. The last time when [Kathryn] was

11

there waiting for [Mother], she was very solemn. I couldn't even entice her to go play. . . . She was just very solemn. And with foster mom, she's more engaged. There's more smiles. . . . In the beginning with [Mother], [Kathryn] was smiling and engaging, but it's diminished.

Greenbach expressed her belief that the bonding between Mother and Kathryn had diminished because of Mother's inconsistent contact with Kathryn in the year preceding the trial.

Finally, Mother expressed that she preferred Kathryn to be placed with a family member if the trial court terminated her parental rights to Kathryn. According to Mother, her sister was "foster parent certified," was CPR certified, and was willing to adopt Kathryn, but the Department never conducted a home study on her sister. Demus testified, however, that she had talked to Mother's sister and that Mother's sister had stated that she did not want to raise Kathryn because she "ha[d] two other children of her own."

Considering the evidence cumulatively under the standards of review articulated above, we hold that the evidence is legally and factually sufficient to clearly and convincingly support the trial court's judgment because the evidence entitled the trial court to form a firm conviction or belief that termination was in Kathryn's best interest. *See J.P.B.*, 180 S.W.3d at 573; *C.H.*, 89 S.W.3d at 28. Specifically, we conclude that although the record contains some evidence that a factfinder could have weighed against a decision to terminate, the trial court could have formed a firm conviction or belief that termination was in Kathryn's best interest from the evidence of Mother's use of cocaine while pregnant with

Kathryn; her criminal history, including a pending felony charge at the time of the termination trial; her failure to attend more than half of the scheduled visits with Kathryn in the near-year preceding the termination trial; her failure to attend almost all of Kathryn's medical appointments, which concerned serious medical issues that Mother would need knowledge of to adequately care for Kathryn; her failure to follow instructions particularly aimed at achieving Kathryn's return to her care (especially as contrasted with the attention to detail that will be required to care for Kathryn's special needs); her sporadic employment history and her lack of a job, other than babysitting, at the time of the trial; her apparent inability to independently provide a residence for herself and Kathryn, as evidenced from the facts that she had been previously evicted and that she lived with her uncle at the time of the trial; and the foster family's contrasting stability (through a planned adoption), ability to properly care for Kathryn, and greater bond with her. *See, e.g.*, *K.M. v. Tex. Dep't of Family & Protective Servs.*, 388 S.W.3d 396, 405 (Tex. App.—El Paso 2012, no pet.) (discussing a parent's failure to visit a child as a factor supporting a decision that the best interest of the child required termination); *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (considering a child's bond with a foster family as a factor supporting the child's best interest in the termination of a father's parental rights); *In re J.N.H.*, No. 02-11-00075-CV, 2011 WL 5607614, at *8 (Tex. App.—Fort Worth Nov. 17, 2011, no pet.) (mem. op.) (considering a parent's criminal and drug histories in affirming a trial court's decision that termination was in the best

interest of a child); *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 255 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc) (concluding that a mother's failures to follow a service plan or to attend appointments arranged by the Department supported a trial court's finding that termination was in a child's best interest). Because we hold that the evidence is legally and factually sufficient to support the trial court's judgment, we overrule Mother's issues.

## Conclusion

Having overruled Mother's issues, we affirm the trial court's order terminating her rights to Kathryn.


TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL: LIVINGSTON, C.J.; GARDNER and WALKER, JJ.

DELIVERED: June 27, 2013